## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 0:19-cv-02736-NEB-KMM |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| STEVEN WAYNE FELDMANN, | |
| Respondent. | |

Ana Voss, Adam Hoskins, and Andrew Tweeten, United States Attorney's Office, 300 S. 4th Street, Suite 600, Minneapolis, MN 55415, counsel for petitioner

Douglas Olson, Office of the Federal Defender, 300 S. 4th Street, Suite 107, Minneapolis, MN 55415, counsel for respondent

## I.    Introduction

Steven Wayne Feldmann is currently in the custody of the Attorney General following a May 2019 determination that he is unlikely to attain the capacity to permit criminal proceedings against him to go forward in the foreseeable future. Pet ¶ 1, ECF No. 1. The government filed a Petition, pursuant to 18 U.S.C. § 4246, asking the Court to find that Mr. Feldmann should not be released because he presently suffers from a mental disease or defect, and as a result, his release would create a substantial risk of bodily injury to others. *Id.* at 2–3. The government seeks an order committing Mr. Feldmann to the custody of the Attorney General for continued hospitalization and treatment until suitable state placement may be found or until his release no longer poses a safety risk. *Id.* Mr. Feldmann opposes the government's Petition.

1

On August 5, 2020, the Court held an evidentiary hearing on the Petition via videoconference. Min. of Hr'g, ECF No. 24. Dr. Melissa Klein, a qualified expert in the field of clinical psychology, testified on behalf of the government. Although Mr. Feldmann appeared by a live feed for the hearing along with his counsel, he did not testify. The Court received several exhibits into evidence pursuant to the parties' agreement. Tr. of Hr'g ("Tr.") at 4–5, ECF No. 28.

Under the relevant statute, the government has a heavy burden to establish that a person should be indefinitely committed to the custody of the Attorney General under § 4246 for continued hospitalization and treatment. The central question in this case is whether Mr. Feldmann's release would pose a substantial risk of bodily injury to others. For the reasons that follow, the Court concludes that the government has met its burden and recommends that the Petition be granted.

## II.    Background

Mr. Feldmann is fifty-six years old. Risk Assessment at 1, 3, ECF No. 2. His family moved from Milwaukee, Wisconsin, to Carmel, California, when he was fourteen. After his parents divorced, he became estranged from his father, who was both physically and psychologically abusive. *Id.* at 3. He remains close with his mother and indicated that if he is released, he would plan to move into her home in Azusa, California. *Id.*; USA-00848.[1] When he was around nineteen years old, Mr. Feldmann got married, and the relationship lasted for

---

[1]    The government produced voluminous Bureau of Prisons records for Mr. Feldmann in connection with the hearing on its petition for civil commitment. The Court cites to those records here by the Bates stamp.

nine years. He is now divorced and has no relationship with his adult daughter. Risk Assessment at 3. He has been homeless for a significant period of his adult life. *Id.* at 4. Mr. Feldmann has a lengthy criminal history and he has been hospitalized due to his mental-illness on several occasions.

### The Underlying Criminal Case

This commitment proceeding finds its origins in a series of events dating back to 2014, which ultimately resulted in a federal criminal complaint being filed in the Western District of Texas. *Id.* at 13–15. The United States Marshals Service began investigating Mr. Feldmann in October 2014 after he made threatening and harassing phone calls to U.S. District Courts and their staff members. *Id.* at 13. On October 7, 2014, Mr. Feldmann was barred from entering an El Paso federal courthouse after repeatedly filing frivolous civil lawsuits. When he later entered courthouse, he was arrested for an outstanding Wisconsin warrant. *Id.*

Almost a year later, in September 2015, Mr. Feldmann was escorted out of a federal courthouse in Las Vegas after he reacted poorly to being told that he would be charged a fee for photocopies. *Id.* In response to this information, he ripped up court documents and threw them in the air. *Id.* Clerk's Office employees were concerned for their safety because of this incident. *Id.* Mr. Feldmann had prior incidents at that courthouse and had previously been asked to leave. *Id.* He was ultimately barred from the Las Vegas courthouse. *Id.*

In February 2016, Mr. Feldmann began placing phone calls to the federal court in El Paso, leaving angry and profane messages. *Id.* He left a series of messages on February 11, 2016 for a U.S. District Court Judge. *Id.* In one message he essentially threatened the judge

and court staff with a "bullet." *Id.* Mr. Feldmann again left erratic and threatening messages for the District Judge in August 2016. *Id.* at 14.

In March 2017, the USMS learned that Mr. Feldmann left two voicemails with the Clerk's Office in the federal court in El Paso, which were described as "obscene and harassing." *Id.* In November that year, he left a message with the El Paso Clerk's Office stating, "I'm gonna take you down… I'm gonna take you to the gallows." *Id.* A staff member in the Clerk's Office noted that she received "biweekly phone calls from Mr. Feldman," and that he was often unintelligible. *Id.* However, the November call was notable because Mr. Feldmann was angrier and began making threats. *Id.* The staff member was concerned that Mr. Feldmann could obtain a firearm and become "an active shooter at the courthouse due to his continued fixation on the Clerk's Office." *Id.*

Between November and December 2017, Mr. Feldmann continued leaving two messages each week with the Clerk's Office in El Paso. *Id.* In one message he mentioned several employees by name, including the United States District Court Judge. *Id.*

> On or about December 4, 2017, Mr. Feldmann left a voicemail for the United States District Judge stating, "I got something for you. I don't know how many [United States District Court Judge] … you think there are in your family. But I'll tell you something. I've got you in Washington DC right now." In an additional voicemail, Mr. Feldmann stated, 'I sure hope you don't get hung by a cherry tree."

*Id.* at 14–15. The District Judge was in Washington, DC, at the time these messages were left. The Judge believed the messages were threatening. *Id.* at 15. A few days later, Mr. Feldmann made a call to the Clerk's Office stating that he "was going to shoot up the place and create a blood bath." *Id.*

4

On December 7, 2017, Mr. Feldmann was charged in the Western District of Texas with communicating a threat to injure another person in violation of 18 U.S.C. § 875(c)[2] and taken into custody. *United States v. Feldmann*, No. 3:17-mj-5388-RB-CG, Doc. No. 3 (W.D. Tex. Dec. 7, 2017); Risk Assessment at 15. At the time of his arrest, he was living in Lynwood, California, at the Highland Manor Guest Home, an assisted living home that provides help with daily activities to seniors. Risk Assessment at 6. In May 2018, the Texas court found, pursuant to 18 U.S.C. § 4241(d), that Mr. Feldmann was not competent to stand trial and ordered him temporarily committed to the Attorney General pending restoration of his competency. *Feldmann*, No. 3:17-mj-5388-RB-CG, Doc. No. 25. The Texas court held a further competency hearing in May 2019 and again found that Mr. Feldmann could not understand the nature and the consequences of the proceedings against him or assist properly in his defense. *Id.*, Doc. No. 35; Pet., Ex. A. The court also found that it was unlikely Mr. Feldmann's competency would be restored in the foreseeable future and committed him to the Attorney General for a risk assessment under 18 U.S.C. § 4246. Pet., Ex. A at 2.

### *Prior Criminal History*

Independent of the underlying criminal case, Mr. Feldmann has been arrested several times over the years. These arrests include charges related to substance abuse. Risk Assessment at 4. He has three arrests for using or being under the influence of controlled

---

[2]    Section 875(c) provides: "Whoever transmits in interstate or foreign commerce any communication containing threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

substances, and four arrests for disorderly conduct while under the influence of drugs or alcohol. *Id.* Mr. Feldmann has seven other arrests for possession of controlled substance paraphernalia, two arrests for transporting or selling narcotics or controlled substances, and one arrest for obtaining drugs with a forged prescription. *Id.* at 4–5; *see also id.* at 9–12. In the 1990s he was diagnosed with alcohol use disorder and cocaine use. Tr. 47.

Mr. Feldmann's history with the criminal justice system is more extensive than just these drug- and alcohol-related charges. Some of his prior criminal charges involve violent offenses. Risk Assessment at 9–12. In Wisconsin, he has a 1991 conviction for "battery to [a] police officer"; a 1996 arrest for "criminal damage to property"; a 1997 charge for battery to a police officer or fire fighter; and a 1999 domestic-abuse related battery charge. *Id.* at 9–10. In California, he has a 2002 battery charge relating to a spouse or ex-spouse. *Id.* at 10. The disposition of these matters varies between convictions, dismissals, or no prosecutions, but "records suggest [Mr. Feldmann's] competency to stand trial was often an issue." *Id.* at 27.

Mr. Feldmann's most recent conviction followed a disturbance at a public library in Madison, Wisconsin, in January 2013. *Id.* at 12. Records from the Mendota Mental Health Institute indicate that Mr. Feldmann became "loud and destructive" when he had trouble with a printer and was asked to log off the computer. *Id.* As a result of an altercation with library staff, he was banned from the computer station. Mr. Feldman was given a letter indicating he had been banned, and he threw the letter at a staff member's face before being told to leave. *Id.* He approached the staff member and threatened to knock him out, causing the worker to be concerned about his safety. *Id.* Mr. Feldmann eventually left the library, but he later returned and attempted to spit on staff members who approached him. *Id.* When he

6

was being booked on February 5, 2013 for this incident, he reportedly "became upset and kneed a police [officer] on her head…. The officer experienced severe headaches and required medical attention." *Id.* at 12–13 (first alteration in original); USA-00630. After that incident, in connection with charges of disorderly conduct, bail jumping and battery to a law enforcement officer, Mr. Feldmann was sent for treatment to restore competency to stand trial from April 2013 through January 2014. USA-00607–635. Upon discharge, the Mendota Mental Health Institute indicated it was unaware of any history of aggression toward others. USA-00610.

### Mental Health History

Mr. Feldmann's mental-health history is incomplete because it relies heavily on his unreliable self-reports. Risk Assessment at 5. He has stated that he was previously diagnosed with schizoaffective disorder, bipolar type. *Id.* He also reported that he has been hospitalized twenty-five times for mental illness, and some records confirm hospitalizations in connection with legal proceedings. *Id.* Mr. Feldmann indicated being hospitalized shortly before his arrest for the underlying charges in the Western District of Texas. *Id.* at 6.

It is known that in August 2017, Mr. Feldmann appeared at an urgent care clinic near Los Angeles, "stating that he was 'mentally distressed and delusional'" and felt he needed medication. Resp. Ex. 1 at 38–39.[3] Mr. Feldmann was homeless at the time of his admission. *Id.* at 47. He reported being off his psychiatric medication for at least a week and had been "hearing voices" and other sounds. But Mr. Feldmann denied thoughts of harming himself

---

[3]    Mr. Feldmann provided an exhibit including records from the Silver Lake Medical Center, which were admitted into evidence as Respondent's Exhibit 1.

or others. *Id.* at 38; *but see id.* at 54 ("He was having thoughts of wanting to die. … He said that he would kill himself."). He agreed to be voluntarily admitted to the mental health unit of the Silver Lake Medical Center. *Id.* at 38. He exhibited paranoid and delusional thought content while he was admitted, and although he received medications he continued to have delusions, hallucinations, and exhibit poor impulse control. *Id.* at 59, 73, 75, , 78, 80, 84, 89, 98, 101, 105, 108. In late August, he agreed to be discharged to the Highland Manor facility in Lynwood, where he was later arrested for the charges in his underlying criminal case. *Id.* at 48.

Following his arrest, Mr. Feldmann was evaluated in Los Angeles, receiving provisional diagnoses of bipolar disorder and anxiety disorder. *Id.* While in the facility in Los Angeles, he experienced auditory and visual hallucinations, but complied with the facility's rules, adapted well to incarceration, and took part in a mental-health treatment group. *Id.* at 6–7. Mr. Feldmann became agitated during some group sessions and expressed his belief that his competency evaluation was being used by the government to discredit him. *Id.* at 7.

Mr. Feldmann later began receiving treatment at the United States Medical Center in Springfield, Missouri, when he was found incompetent to stand trial. *Id.* He received mood stabilizing medications and "presented as cooperative yet guarded, and he did not respond to hallucinations." *Id.* at 7–8. He insisted he was owed a large amount of money and claimed that there was no criminal case against him. *Id.* at 8. In August 2018, he was moved to a less restrictive housing unit. At first, he adjusted well to the changed setting. *Id.* However, his behavior in September and October 2018 led to an extension in his competency restoration treatment. *Id.* (describing Mr. Feldmann talking to himself during a group meeting and

expressing paranoid delusions about being "'set up' for his criminal charges because the [S]tate of Texas owed him 120 million dollars as a result of two civil lawsuits"). Mr. Feldmann refused recommended increases to his anti-psychotic medication to treat his symptoms while at the Springfield medical center. *Id.* at 8, 29. During his "following period of treatment, Mr. Feldmann continued to express grandiose and paranoid delusions as well as disorganized and nonsensical communication." *Id.* at 8.

Mr. Feldmann was ultimately transferred to the Federal Medical Center in Rochester, Minnesota, on September 3, 2019. *Id.* at 15. During his intake evaluation he engaged in some rambling statements, exhibited signs of paranoia, and denied any homicidal ideation. USA-00855. However, during a rambling statement he indicated that a judge connected to his civil cases in Texas "should be shot in the head." *Id.* He was cooperative during the early part of his hospitalization there, appeared to sleep well, maintained good hygiene, and attended scheduled meals three times a day. Risk Assessment at 15–16. He also got along with his peers. *Id.* at 16. However, during some interviews, he exhibited signs of auditory and visual hallucinations as well as paranoia. *Id.* He also showed signs of grandiose delusions during this time. *Id.* at 16–17.

In a September 2019 interview with a psychology intern, Mr. Feldmann "became agitated with the interviewer … and accused him of being a 'bully.'" *Id.* at 17. Mr. Feldmann became guarded during basic questions and took on a hostile tone. *Id.* He requested a meeting with his psychologist after the interview and was irritable about the intern's behavior, accusing him of speaking in an aggressive manner. *Id.* at 17–18. Due to Mr. Feldmann's increased paranoia about staff members and his rapid changes in mood, he

was placed in a secured unit. *Id.* at 18. Mr. Feldmann's reaction to the incident was characterized by misperceptions of what occurred and perseveration, but he did not voice any threats or thoughts of harming others. USA-00913–916. Mr. Feldmann soon left the secured unit and lived on the open housing unit since that incident. Tr. 35–36.

### Risk Panel Assessment

In October 2019, a Risk Assessment Panel at FMC Rochester diagnosed Mr. Feldmann as having schizoaffective disorder, bipolar type, according to the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition*.[4] Risk Assessment at 18; Tr. 9. According to Dr. Melissa Klein, "[w]hen a person experiences schizoaffective disorder[], they have symptoms of full schizophrenia or a psychotic illness as well as mood symptoms at times during the course of the psychotic illness. The psychotic symptoms include hallucinations, delusions, disorganized thoughts and speech and disorganized behavior…." Tr. 9. The diagnosis is also marked by symptoms of depression, mania, or both, and may include suicidal affect. *Id.*

Mr. Feldmann has exhibited these symptoms as far back as the 1990s and has a "very long history of psychiatric hospitalizations" related to his mental disorder. *Id.* at 10–11; Risk Assessment at 18–19. In particular, he has exhibited auditory hallucinations, has been seen talking to himself when nobody else is present, and possible visual hallucinations, including seeing a woman over the shoulder of an examiner. Tr. 11. Mr. Feldmann has also exhibited

---

[4]    The Panel found there was not enough evidence to diagnose Mr. Feldmann with a substance use disorder, but noted that this was largely due to lack of information. The Panel observed that Mr. Feldmann's history suggests substance use has been a significant problem in his past. Risk Assessment at 19.

delusional thinking, including paranoid delusions and grandiose delusions. *Id.* He believes he

is being retaliated against for pursuing civil litigation, that he is "owed a large settlement

from the [S]tate of Texas for his involvement … in an accident on a Greyhound bus back in

2010." *Id.* at 11–12. He believes that he has worked undercover for the Navy, though there

are no records of him ever being involved in the Navy. *Id.* at 12. Mr. Feldmann has claimed

to be working undercover as a lawyer, a nurse, and a CIA agent. *Id.* In addition,

Mr. Feldmann has exhibited disorganization during his time at FMC Rochester. *Id.* He is

unable to form clear or coherent thoughts and engages in illogical speech. *Id.* Mr. Feldmann

has also demonstrated irritability and hostility. *Id.* at 12–13; Risk Assessment at 18–19.

       The Panel found that Mr. Feldmann continues to exhibit symptoms associated with

his mental disorder.

> Mr. Feldmann continues to experience delusions, paranoia, grandiosity, and
> irritability despite his compliance with his medications. Considering his
> current level of treatment compliance, it is likely that he will continue to
> demonstrate these symptoms and maintain his current level of functioning.
> Given Mr. Feldmann's extensive criminal history, current mental illness, and
> continued problems with agitation and impulsive behaviors, his prognosis is
> judged to be poor. It … appears that, if released without providing a
> structured environment that includes financial and medication management,
> Mr. Feldmann's condition will likely not improve and may worsen
> significantly.

Risk Assessment at 19.

       The Risk Panel was concerned about Mr. Feldmann's behavior leading up to his

arrest on the current charges, as well as his history of hospital and detention-center

placements during his adolescence and his adult arrests for aggressive behavior. *Id.* at 27.

The Panel was troubled by Mr. Feldmann's history of violent acts, including "actual

attempted, and threatened physical harm to people," and the escalation of his verbal threats

over time. *Id.* The Panel has concerns about future violent behaviors due to Mr. Feldmann's "history of poor psychosocial adjustment…." *Id.* The Panel members believe it is likely that Mr. Feldmann's "mental illness played a significant role in may of his past aggressive behaviors," noting his fixation on "delusional perception of injustice" connected to his filing of frivolous lawsuits. *Id.* at 29–30. Mr. Feldmann "continues to view his efforts [to obtain a large sum of money from a Greyhound bus accident] as both justified and appropriate based on distorted perceptions of reality." *Id.* at 30. His aggressive behavior appears most likely to occur when he believes he is being persecuted by others and when his symptoms are more severe. *Id.*

Ultimately, the Risk Assessment Panel concluded that Mr. Feldmann's release would create a substantial risk of bodily injury to another person because of his mental disease or defect and recommended that he be committed pursuant to 18 U.S.C. § 4246. *Id.* at 33. The Panel noted: (1) Mr. Feldmann's lack of insight into his mental illness, substance use issues, need for mental health treatment, and aggressiveness; (2) his severe symptoms of mental illness continuing despite treatment; (3) continued violent ideation, including thoughts of harming others; (4) "problems maintaining affective, behavioral, and cognitive functioning" while in BOP custody; and (5) persistent challenges remaining compliant with mental health treatment at USMCFP Springfield and FMC Rochester. *Id.* at 30–32.

The Panel also noted that Mr. Feldmann would likely be homeless if released in the community, with easy access to alcohol, drugs, and weapons. *Id.* at 32. There is no plan in place for Mr. Feldmann to receive professional services like health care, social services, or other supervision that could mitigate the risk he would engage in violent acts. *Id.*

Mr. Feldmann has little or no personal community support from family, friends, and acquaintances. *Id.* He would have difficulty complying with necessary mental health treatment. *Id.* And he would have a difficult time dealing safely with stressful living circumstances and life events. *Id.*

## III.    Discussion

Section 4246 authorizes the continued involuntary commitment of a person who has been committed to the custody of the Attorney General under 18 U.S.C. § 4241(d).[5] 18 U.S.C. § 4246. To commit Mr. Feldmann under § 4246, the Court must find that: (1) he suffers from a mental disease or defect; (2) because of his mental disease or defect, his release would cause a substantial risk of bodily injury to another; and (3) there is no suitable state placement. 18 U.S.C. § 4246.

Explaining the standard of clear and convincing evidence that the government must meet in a case like this, courts have recognized they are tasked with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe,' . . . [and are] also guided by the fact that the statute imposes a high standard of proof on the Government." *United States v. Chairse*, 18 F. Supp. 2d 1021, 1025 (D. Minn. 1998) (report and recommendation of Mason, M.J., adopted by Kyle, J.) (quoting *United States v. S.A.*, 129 F.3d

---

[5]    Section 4241(d) provides for the commitment of a criminal defendant where a preponderance of the evidence shows that the person "is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense…."

995, 1000 (8th Cir. 1997)). One court considering a § 4246 commitment petition has

described the evidentiary standard as follows:

> The clear and convincing standard is demanding. The Supreme Court has
> instructed that the standard is met only when a party can place in the ultimate
> factfinder an abiding conviction that the truth of its factual contentions are
> highly probable. This standard is satisfied only when the material [one party]
> offered instantly tilted the evidentiary scales in its favor when weighed against
> the evidence [the other party] offered in opposition.

*United States v. Smith*, 964 F. Supp. 2d 167, 172 (D. Mass. 2013) (cleaned up).

Although the burden of proof is high, the statutory standard at issue is inherently

based on probabilities because it is focused on "risk" of harm presented by a person's

release. *Cf. United States v. Steil*, 916 F.2d 485, 488 (8th Cir. 1990) (noting that the district

court considers "the potential danger a [person] poses to society") (internal quotations

omitted). This means that the government need not establish that bodily injury to others or

harm to property is certain to occur if a person is released, but rather that there is a "genuine

possibility of future harm to persons or property." *United States v. Sahhar*, 917 F.2d 1197,

1208 (9th Cir. 1990).

As explained below, the Court concludes that the government has satisfied the heavy

burden of showing that commitment under § 4246 is appropriate in this case.

### A.    Mental Disease or Defect

Before turning to the issues of dangerousness and state placement, which are the

focus of the parties' dispute, the Court finds that the government has shown Mr. Feldmann

suffers from a mental disease or defect—namely, schizoaffective disorder, bipolar type. The

parties do not dispute this issue. Pet'r's Mem. at 14–15, ECF No. 30; Resp't's Mem. at 1,

ECF No. 34. Having reviewed the record, the Court finds there is clear and convincing

evidence establishing that he has schizoaffective disorder, bipolar type. *See* Risk Assessment at 18–19; Tr. 9.

### B.   Risk of Dangerousness

When assessing whether a person's release would present a substantial risk of bodily injury to another, courts consider several factors. In *United States v. Ecker*, 30 F.3d 966 (8th Cir. 1994), the court identified the following factors as relevant to the risk-of-dangerousness assessment: "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incidents manifesting dangerousness, and a history of problems taking prescribed medications." *Id.* at 970.

The Court finds that the government has met its burden to show that Mr. Feldmann's release would present a substantial risk of bodily injury to another because of his mental-health condition. Mr. Feldmann has a lengthy criminal history including several incidents involving alcohol or drug use. His criminal history also includes several past arrests and charges for violent crimes. In the underlying criminal offense that led to his current commitment, Mr. Feldmann engaged in a campaign of harassing and threatening behaviors that culminated with threats to a federal judge. Even after he was taken into custody, he continued to express violent ideas, including that a judge should be shot in the head. Mr. Feldmann correctly points out that the evidence concerning his criminal history is short on detail and not all of the offenses for which he was charged or arrested ended in convictions. The Court nevertheless finds that his extensive criminal history, which spans much of Mr. Feldmann's adult life, weighs in favor of commitment.

The Court also finds the Risk Assessment Panel's evaluation to be strong evidence supporting a finding that his release would present a substantial risk. In reaching its conclusion, the Panel was similarly concerned with Mr. Feldmann's criminal history, including arrests for violent conduct, and his conduct underlying the current criminal charges. The Panel focused as well on Mr. Feldmann's history of poor psychosocial adjustment, including: antisocial behaviors; problems establishing and maintaining relationships; difficulty with educational programs and employment; history of drug- and alcohol-related arrests; problems with cognition and affect; his history of traumatic experiences during his childhood; attitudes supportive of violence; and problems complying with mental health treatment and supervision plans. The Panel believes Mr. Feldmann's mental illness played a significant role in his threatening behaviors before and during his arrest on the current charge. The Panel members also expressed concern that Mr. Feldmann lacks insight into his mental illness, substance abuse problems, and need for mental-health treatment. And Mr. Feldmann's continued display of symptoms despite being treated with antipsychotic medication further exacerbates the risks presented were he to be released.

If Mr. Feldmann were released, the evidence suggests that he would lack any meaningful support in the community. He would likely be homeless and have very limited or no access to mental health treatment. Mr. Feldmann would also have access to alcohol, drugs, and weapons that he lacks in the controlled environment of FMC-Rochester. Mr. Feldmann was not taking medication to treat his mental health disorders at the time he was arrested and it is likely, if he were to be released, that he would again be without necessary medication to treat his serious symptoms. Unfortunately, this would likely make it

even harder for Mr. Feldmann to function in the community and exacerbate the delusional

and paranoid symptoms that contribute to the behaviors which led to his arrest in December

2017.[6] *See* Tr. 28–30 (discussing similar concerns regarding the likely outcome of

Mr. Feldmann's release).

Mr. Feldmann argues that the government's showing is lacking because he recognizes

he has a mental illness, accepts medication, and participates in programming while at FMC-

Rochester. Resp't Mem. at 4. However, Dr. Klein emphasized that Mr. Feldmann lacks

insight into his mental illness and his need for treatment, that he has a poor history of

complying with medications, and that he remains symptomatic even when medicated.

Tr. 28–29. These facts increase the risk of injury to others if he were to be released because

he likely would likely not have access to the structured treatment environment where he has

been able to make some progress in managing his condition.

Mr. Feldmann argues that the government has failed to demonstrate that he has a

substance abuse problem. Resp't Mem. at 14. The Court notes that Mr. Feldmann likely

has not been abusing drugs or alcohol in the recent past because he has been in the custody

---

[6]    Mr. Feldmann correctly points out that he has not been convicted on the charges in
his underlying criminal case. However, the Eighth Circuit has not criticized consideration of
the conduct involved in a pending charge as part of a dangerousness evaluation. *Ecker*, 30
F.3d at 970 n.6 (noting that "Ecker had a history of carrying weapons, including the pending
charge in this case," which was a felon in possession prosecution). The Court also notes that
the criminal complaint in the Texas case is supported by a sworn affidavit that indicates
Mr. Feldmann frequently identified himself when making threatening and harassing
statements to court personnel in the Western District of Texas. USA-00721–724. There is no
evidence in the record that undermines the showing that Mr. Feldmann engaged in this
conduct or made the threatening statements regarding the Texas Judge. Nor is there any
indication that Mr. Feldmann did not make the statements attributed to him.

of the BOP since his arrest in December 2017. Dr. Klein acknowledged that Mr. Feldmann has denied a current substance abuse problem and that there is no indication he is currently abusing substances. Tr. 46–47. However, the Court notes that the Risk Assessment Panel discussed record evidence showing Mr. Feldmann had multiple arrests involving drugs or alcohol use, trafficking, and possession. Risk Assessment at 4–5. Though the Panel thought it lacked enough evidence to make a substance abuse diagnosis, it went on to explain: "There are clear indications that substance abuse caused Mr. Feldmann significant problems in the past." *Id.* at 19. Mr. Feldmann's past legal troubles connected to substance use cause the Court substantial concern that releasing him to an uncontrolled environment would lead to future drug and alcohol use, increasing the risk that he would engage in dangerous behavior.

Mr. Feldmann asserts that the government has not made a strong showing that he has a history of violent or assaultive conduct. Resp't's Mem. at 13–14. The Court acknowledges that this is not a case in which there are recent acts of physical violence toward others. But "[o]vert acts of violence are not required to prove dangerousness." *United States v. Williams*, 299 F.3d 673, 677 (8th Cir. 2002) (citing *United States v. S.A.*, 129 F.3d 995 (8th Cir. 1997)). Here, despite the limited evidence of violence there is evidence that presents concerns of dangerousness. Specifically, Mr. Feldmann's conduct in the underlying criminal case and his behavior at the library in Wisconsin in 2013 both raise serious concerns. His fixation on federal court personnel, culminating in threatening messages to a federal judge and identifying the judge's contemporaneous location in Washington, DC, presents a substantial risk that, if released, he is likely to engage in similar conduct, which could easily escalate into harm to another. His conduct at the library included physical reactions—throwing paper at a

18

library employee, spitting in the faces of library staff members, and assaulting a police officer

during the booking process following these actions. These incidents contribute to the

government's showing that Mr. Feldmann's release would present a substantial risk of

dangerousness.

Further, the Court finds persuasive Dr. Klein's testimony about the concerns present

in this case, including her acknowledgment of the limited evidence concerning

Mr. Feldmann engaging in physically violent behavior.

> As I mentioned, there's a multitude of factors that we consider when we're
> assessing risk. Actual physical violence is a component of that, and like we've
> discussed, it's not an extremely prominent piece of Mr. Feldmann's history,
> but the piece about the nature of the mental illness symptoms he experiences,
> the ideation that he has about using violence as an appropriate means to get
> his concerns addressed and met, that escalation of pattern of incidents over
> time, all coupled with the psychological factors that we also discussed, it's all
> of those things together that we consider when we're looking at somebody's
> risk for future violence or the risk to in the future to potentially cause harm or
> serious damage.

Tr. 55. Dr. Klein discussed evidence in the record indicating Mr. Feldmann had been

charged with battery and domestic violence. Tr. 27. These details support the government's

petition for commitment because they are consistent with a finding that Mr. Feldmann's

release would present a substantial risk of future violent conduct.

Mr. Feldmann is correct to highlight his non-aggressive behavior since he began

treatment at FMC-Rochester. But this success appears attributable to the controlled prison

hospital environment more than any permanent change in Mr. Feldmann's condition.

*Williams*, 299 F.3d at 677; *S.A.*, 129 F.3d at 1001 ("S.A. has spent most of his time at FMC-

Rochester in isolation and has therefore had minimal contact with others and, consequently,

minimal opportunity to engage in violent behavior."). If released from custody and provided

none of the structure and support he is currently receiving, Mr. Feldmann may quickly return
to the escalating and threatening conduct that culminated in his most recent arrest.
Moreover, Mr. Feldmann's time at FMC-Rochester has not been entirely without incident.
He became agitated with an intern when being interviewed and accused the intern of
speaking to him in an aggressive manner. While by no means sufficient on its own to sustain
a commitment, this behavior resembles the early stages of the conduct that led to
Mr. Feldmann being banned from the library in Wisconsin and from the federal courthouses
in Las Vegas and El Paso.

Mr. Feldmann also correctly points out that there is no evidence in this case of
"previous use of weapons," one of the factors the Eighth Circuit has explicitly listed as a
relevant consideration in determining a risk of future violence. *See* Resp't Mem. at 14[7]; *Ecker*,
30 F.3d at 970. The list of factors recognized in *Ecker*, including previous use of weapons,
are not an exclusive list and they are not prerequisites upon which a commitment order must
be conditioned. *See Ecker*, 30 F.3d at 970 (stating only that the list of factors the
government's experts considered pointed toward a finding of dangerousness "*include*: a
history of dangerousness, a history of drug or alcohol use, identified potential targets,
previous use of weapons, any recent incidents manifesting dangerousness, and a history of
problems taking prescribed medicines") (emphasis added). Here, Dr. Klein credibly testified
that the absence of a "history of access to weapons … could escalate but the absence of it is
not necessarily going to mitigate what we consider for risk when we have the host of other

---

[7]    The government concedes there is no evidence that Mr. Feldmann has used weapons
in the past. Pet'r Mem. at 16 n.4.

factors that we're concerned about." Tr. 55–56. In other words, the Risk Panel in this case reached the conclusion that Mr. Feldmann's release would present a substantial risk even though they had no indication that he used weapons in the past. Given the careful consideration the experts gave to Mr. Feldmann's other risk-related factors, the absence of a previous use of weapons does not defeat the government's showing here.

For these reasons, the Court concludes that the government has adequately shown that because of Mr. Feldmann's mental disease or defect, his release would present a substantial risk of injury to another person.

### C.    State Placement

Mr. Feldmann argues that the government has failed to present clear and convincing evidence that there is no suitable state placement in this case, and the Court agrees. Resp't's Mem. at 16. The showing regarding state placement at the hearing was sorely lacking.[8] However, Mr. Feldmann's argument that this is fatal to the petition is foreclosed by the Eighth Circuit's decision in *United States v. Wigren*, 641 F.3d 944 (8th Cir. 2011).

In *Wigren*, when the government filed a petition to determine that Mr. Wigren should be civilly committed under § 4246, the Springfield Medical Center's warden certified that "suitable arrangements for state custody and care … were not available." *Id.* at 945. The district court ordered Mr. Wigren committed pursuant to § 4246, and Wigren appealed. On

---

[8]    The government's only evidence on this point was that they had asked California to take Mr. Feldmann back into a state hospital setting, but California declined. Tr.  at 30–31; ECF No. 1-5 (Letter from CA Dept' of State Hosp. to E. Meyer (Oct. 7, 2019)). This showing is considerably less robust than this Court has seen in other commitment proceedings under § 4246, both as a judge and as a litigator, but *Wigren*'s holding clearly requires no more than what the government presented in this case.

appeal he argued that "the warden's 'unsubstantiated' certification that no suitable state placement was available violated the [Insanity Defense Reform Act ("IDRA"), 18 U.S.C. §§ 4241–4247.]" *Id.* at 945, 946. The Eighth Circuit rejected this argument, concluding that the government complied with the statute. *Id.* at 946. The court explained that, in the first instance, "[t]o stay a person's release and trigger a hearing on civil commitment, the IDRA requires only that the warden certify that 'suitable arrangements for State custody and care of the person are not available.'" *Id.* When the warden filed such a certification, the court explained, it was "sufficient on its face, and facial sufficiency is all the statute requires." *Id.* Further, the court explained that the "IDRA does not provide for judicial review of the certification, or establish standards by which a court could determine whether 'suitable arrangements for State custody' are available." *Id.* at 946–47 (citing *United States v. Vancier*, 515 F.2d 1378, 1380–81 (2d Cir. 1975)).

Mr. Wigren raised a second, related argument that "the district court erred in finding after a hearing that the government established, by clear and convincing evidence, that suitable arrangements for state custody and care were not available." *Id.* at 947.

> Although some of our cases have assumed in dicta that the court must make such a finding before ordering commitment of a person, *e.g.*, *United States v. LeClair*, 338 F.3d 882, 884 (8th Cir. 2003); *United States v. Ecker*, 30 F.3d 966, 970 (8th Cir. 1994), we conclude that the statute does not require it. There is thus no need to review the district court's determination about the availability of arrangements for placing Wigren in state custody. The statute is clear about what is required of the court after a hearing under § 4246. The court must commit the person to the custody of the Attorney General if "the court finds by clear and convincing evidence that [1] the person is presently suffering from a mental disease or defect as a result of which [2] his release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d). The statute requires an initial certification by the warden about the availability of state custody, but does not

call for the government to present evidence on that matter, or for the court to make a determination about it.

*Id.*

Following *Wigren*, the government was not required to present clear and convincing evidence that suitable arrangements for state custody and care were not available for Mr. Feldmann. It needed only the FMC-Rochester warden's certification that no such arrangements were available to trigger the hearing on civil commitment. When the government filed its Petition, the FMC-Rochester warden certified that "suitable arrangements for state custody and care of [Mr. Feldmann] are not currently available." ECF No. 1-3. Thus, for Mr. Feldmann's civil commitment to comply with the IDRA, the Court must find by clear and convincing evidence that he has a mental disease or defect, and as a result of which, his release would create a substantial risk of bodily injury to another person or serious property damage. Accordingly, for the Court to order Mr. Feldmann's commitment as requested in the government's petition, the government need not present, and the Court is not required to find, clear and convincing evidence that a state placement is unavailable.

As *Wigren* makes clear, "if the person is committed after a hearing," as this Court recommends here, the IDRA "places responsibility on the Attorney General to release the person to the State where the person is domiciled or was tried, or periodically to 'exert all reasonable efforts to cause such a State to assume … responsibility.'" 641 F.3d at 947 (quoting 18 U.S.C. § 4246(d)). The government will continue to have this burden if this Court's recommendation is adopted and Mr. Feldmann is committed, and it must engage in meaningful and periodic efforts to arrange state placement. But "the statute does not endow

23

the committed person with a judicially enforceable 'right' to state custody that must be adjudicated at the hearing." *Id.* Though Mr. Feldmann states that he disagrees with the Eighth Circuit's decision in *Wigren* and asks that it not be followed, this Court is not free to ignore its holding.

## Recommendation

Based on the foregoing, the Court recommends that the government's Petition, ECF No. 1, be GRANTED, and that Mr. Feldmann be committed to the custody of the Attorney General for hospitalization and treatment in a suitable facility until a suitable state placement may be found or he is no longer in need of such custody for care or treatment in such a facility.

Date: February 17, 2021

*s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.